**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

EDWARD A. TAYLOR,

        Plaintiff,

    vs.                   **Case No. 07-4078-RDR**

MICHAEL J. ASTRUE,
Commissioner of Social
Security,

        Defendant.

_____

## MEMORANDUM AND ORDER

Plaintiff has filed applications for social security disability benefits and for supplemental security income benefits. Plaintiff alleges a disability onset date of February 1, 2004. The applications were denied by defendant on the basis of the October 26, 2006 opinion of an administrative law judge (ALJ). This case is now before the court to review defendant's decision to deny benefits.

STANDARD OF REVIEW

The court reviews defendant's decision to determine whether the decision was supported by substantial evidence and whether the correct legal standards were applied. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). Substantial evidence is such evidence that a reasonable mind might accept to support the conclusion. Rebeck v. Barnhart, 317 F.Supp.2d 1263, 1271 (D.Kan. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The court must examine the record as a whole, including whatever in the record

fairly detracts from the weight of the defendant's decision, and on

that basis decide if substantial evidence supports the defendant's

decision.  Glenn, 21 F.3d at 984.

ALJ DECISION (Tr. 13-22)

The ALJ's decision sets forth the five-step evaluation process

followed in these cases:

> At step one, the undersigned must determine whether the
> claimant is engaging in substantial gainful activity. .
> . . At step two, the undersigned must determine whether
> the claimant has a medically determinable impairment that
> is "severe" or a combination of impairments that is
> "severe" . . . . At step three, the undersigned must
> determine whether the claimant's impairment or
> combination of impairments meets or medically equals the
> criteria of an impairment listed in 20 CFR Part 404,
> Subpart P, Appendix 1 . . . . Before considering step
> four of the sequential evaluation process, the
> undersigned must first determine the claimant's residual
> functional capacity . . . . Next, the undersigned must
> determine at step four whether the claimant has the
> residual functional capacity to perform the requirements
> of his past relevant work . . . . At the last step of the
> sequential evaluation process . . . , the undersigned
> must determine whether the claimant is able to do any
> other work considering his residual functional capacity,
> age, education, and work experience.

(Tr. 14-15).

The ALJ found that plaintiff has not engaged in substantial

gainful activity since February 1, 2004.  He determined that

plaintiff has the following severe impairments:  degenerative

arthritis of the lumbar spine; borderline intellectual functioning;

and intermittent history of alcohol abuse.  According to the ALJ,

these impairments, together or separately, did not satisfy the

criteria of a disabling impairment listed in Appendix 1, Subpart P

of 20 C.F.R. Part 404.   He found that plaintiff retained the

capacity to do light work, lifting up to 20 pounds on an occasional

basis and 10 pounds on a frequent basis, but that he would be

limited to performing jobs that only involve simple, routine,

repetitive work.   The ALJ determined that plaintiff could not

return to his past relevant employment as an industrial janitor

because that job required a medium level of exertion which was

beyond plaintiff's residual functional capacity.   Finally, the ALJ

held that given plaintiff's age, limited education, work

experience, and residual functional capacity, there are jobs

available in significant numbers that plaintiff can perform.   The

ALJ made this finding on the basis of the medical-vocational

guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.   These are

sometimes referred to as grid regulations.

PLAINTIFF'S ARGUMENTS

Mental retardation as a "severe" impairment

Plaintiff argues that the ALJ erred in finding that

plaintiff's "mental retardation" was not "severe."   (Tr. 16).

Specifically, the ALJ stated:

> The claimant does have a severe mental impairment in
> terms of his intellectual functioning. However, it does
> not rise to such a level that it meets or equals a
> disability as determined under social security listing
> 12.05. Although claimant has scored in the borderline to
> mildly retarded range . . . he appears to lack the
> requisite deficits in adaptive functioning as stated in
> the listing.   Nor does claimant's file contain
> documentation of these deficits during the developmental
> period (before age 22).   Because of this lack of

3

evidence, and claimant's general adaptive functioning, <u>his mental impairment is not considered sufficiently severe as to be disabling</u>.

(Tr. 16)(emphasis added).  Defendant has responded that plaintiff's argument takes the ALJ's statement out of context.  The ALJ was addressing step three of the social security analysis when he made the statement highlighted above, after he had already concluded that plaintiff's "borderline intellectual functioning" was a "severe impairment" as part of his step two analysis.

   We agree with defendant that plaintiff's argument conflates the ALJ's step two and step three analysis.  The ALJ found that plaintiff had a "severe" mental impairment for purposes of step two analysis.  The ALJ's statements during his step three analysis do not contradict this point.

   Listing 12.05C

   Step 3 analysis in this case requires a consideration of whether plaintiff meets the specific criteria in Listing 12.05 of the Listing of Impairments.  Plaintiff has the burden of proving that his impairment satisfies the conditions in Listing 12.05.  See <u>Barron v. Sullivan</u>, 924 F.2d 227, 229 (11th Cir. 1991).  Listing 12.05 states in relevant part that:

> Mental retardation:   Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; <u>i.e.</u>, the evidence demonstrates or supports onset of the impairment before age 22.
>       The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> . . . .
> C.  A valid verbal, performance, or full scale IQ of 60
> through 70 and a physical or other mental impairment
> imposing an additional and significant work-related
> limitation of function;

20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.05.

Plaintiff contends that he qualifies for social security benefits under paragraph C of Listing 12.05.  To qualify for such benefits, plaintiff's impairments must satisfy the criteria set forth in paragraph C as well as the diagnostic description for mental retardation which precedes paragraph C.  20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00(A).

Plaintiff contends that these criteria are satisfied in the record.  The record shows that plaintiff had a full scale IQ score of 63.  In addition, the ALJ has found that plaintiff has "severe" physical impairments preventing plaintiff from continuing with his prior employment.  These qualify as impairments "imposing an additional and significant work-related limitation of function." Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997).  Therefore, the issues which remain appear to be whether the IQ score is "valid" and whether the evidence shows that plaintiff has deficits in adaptive functioning which initially manifested during the developmental period (before age 22).

The ALJ determined that despite plaintiff's IQ score, he lacked the "requisite deficits in adaptive functioning" and there was no documentation of "these deficits during the developmental

period (before age 22)."   (Tr. 16).   The ALJ also commented

regarding plaintiff's IQ score:

> This score, however, does not appear to accurately
> reflect the claimant's level of functioning.   In his
> report the psychologist [Dr. Robert Barnett] noted that
> the claimant got along socially with his co-workers and
> supervisors at his last job.  The claimant was able to do
> some cooking.   He occasionally attended church, and,
> while giving the impression of having borderline
> functioning, his thought process was nevertheless logical
> and coherent.   There were no indications of disturbance
> of thought during the interview.   He managed to stay
> alert and oriented throughout the interview process, and
> his attention and concentration were appropriate.
>
> A PRTF was completed by Charles Warrender, M.D., on
> July 16, 2004.   Dr. Warrender noted that while the
> claimant gave the appearance of possibly being mildly
> retarded, he had very few limitations.  The claimant had
> only mild limitations in his activities of daily living
> and in maintaining social functioning.  He exhibited a
> moderate   degree   of   limitation   in   maintaining
> concentration, persistence or pace.  Dr. Warrender noted
> that the claimant's impairment in this category was not
> severe enough to meet or equal any listing.  The mental
> RFC by Dr. Warrender echoes the findings on the PRTF.
> The claimant was found to be only moderately limited.
> Dr. Warrender particularly noted that the claimant had
> demonstrated   the   ability   to   perform   competitive
> employment over many years.   The claimant is able to
> understand and follow intermediate level instructions and
> is able to relate adequately to his supervisors and co-
> workers.   He was found to be able to deal with routine
> changes   in   the   job   setting,   exercise   adequate   work
> judgment, and to work on a sustained basis.   These
> findings were later confirmed by R.E. Schulman, Ph.D. on
> October 18, 2004.
>
> Claimant's   former   supervisor   completed   a   Work
> Activities Questionnaire on September 9, 2004. He stated
> that the claimant was considered to be part of the
> "cleanup personnel."  He observed that the claimant had
> no limitations in his ability to perform his job duties.
> He   had   no   problem   in   understanding   and   following
> directions.   He had no problem performing his duties in
> a timely and satisfactory manner.   He needed no extra
> supervision and was able to adequately concentrate on his
> job.   He   was   given   no   special   consideration   or   job

6

>modification because of any impairment or disability.  He
>was able to learn new tasks in an acceptable timeframe.
>There was no noticeable change in the claimant's
>performance during the time of his employment.   His
>former employer would be willing to rehire him if the
>claimant applied for a job.

(Tr. 18-19).

If these comments were meant to discredit the validity of
plaintiff's IQ score, the court rejects them.  Dr. Barnett did not
suggest that the IQ score was invalid for any reason.  Nor did the
reviewing psychologist, Dr. Warrender.  (Tr. 162).  An ALJ "cannot
reject IQ scores based on personal observations of the claimant and
speculative inferences drawn from the record."  Morales v. Apfel,
225 F.3d 310, 318 (3d Cir. 2000); see also, Markle v. Barnhart, 324
F.3d 182, 187 (3d Cir. 2003); Muntzert v. Astrue, 502 F.Supp.2d
1148, 1158 (D.Kan. 2007) (disputing significance of continuous
employment and limited education to the validity of an IQ score
consistent with mild mental retardation).

The ALJ did clearly find that plaintiff lacked the requisite
deficits in adaptive functioning to satisfy Listing 12.05C.
Adaptive functions include "cleaning, shopping, cooking, taking
public transportation, paying bills, maintaining a residence,
caring appropriately for [one's] grooming and hygiene, using
telephones and directories, and using a post office."  20 C.F.R.
Pt. 404, Subpt. P, App. 1 § 12.00(C)(1).  In Novy v. Astrue, 497
F.3d 708, 710 (7th Cir. 2007), the court, citing the American
Psychiatric Association, Diagnostic and Statistical Manual of

Mental Disorders, Text Revision (DSM-IV-TR) 42 (4th ed. 2000), stated that "deficits in adaptive functioning" denoted an "inability to cope with the challenges of ordinary everyday life." In Witt v. Barnhart, 446 F.Supp.2d 886, 895 (N.D.Ill. 2006), the court made reference to the American Psychiatric Association's DSM-IV as stipulating that "in order to be mentally retarded an individual must have significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety."

The evidence with regard to adaptive functioning comes mainly from:  Dr. Barnett; plaintiff's prior employer; and plaintiff.

On the basis of his interview with plaintiff (Tr. 153-55), Dr. Barnett reported that plaintiff dropped out of the tenth grade to go to work.  Plaintiff had no further education.  While in school, he was in special education classes for students who were slow learners.  Plaintiff's last job was with a meat packing plant, where he did sanitation work.  His job performance was satisfactory.  He held the job for nine years before leaving because of physical difficulties.

At the time of his interview with Dr. Barnett, June 30, 2004, plaintiff lived with his wife and had very few activities. He occasionally attended church.  He did not have a driver's license

8

and did not drive to the interview.

Dr. Barnett observed that plaintiff displayed below average personal hygiene.   He found plaintiff to be cooperative and friendly.   Plaintiff appeared to have low intellectual functioning but adequate social functioning.   Plaintiff stammered, but was understandable.   His thought processes appeared logical and coherent and he appeared alert and fully oriented during the interview.  He could not name the current president.  He could not do any steps of serial 7's accurately.  He could recall one out of three items in three minutes.   Dr. Barnett concluded his report with this assessment of plaintiff's ability to work:

> Mr. Taylor does appear to be cognitively limited and in addition to showing signs of low intellectual functioning during the interview, his scores on the WAIS-III were in the mildly mentally retarded range.  Nevertheless, his attention and concentration were appropriate for the interview. Mr. Taylor relates a positive history of work relationships and other than his obvious difficulties with pain during the interview, he was friendly and pleasant.   Mr. Taylor appears capable of simple work tasks but not complex work tasks.   There are no discrepancies noted in the interview with regard to his self-reported documents provided with the referral.  Mr. Taylor's only source of income at this time is General Assistance and he appears capable of managing his own funds.

(Tr. 155).

Plaintiff's   wife   (now   deceased)   assisted   plaintiff   in completing the activities of daily living form on May 13, 2004. (Tr. 97).  The form indicated that plaintiff needed help in caring for his personal needs.   He did not do laundry or housekeeping

chores.  He did some cooking when he could, but required help.  He did not handle his own money or pay bills.  He needed help reading forms and understanding the bills.  He did not shop, drive or use public transportation.  He read the newspaper during the day, but had no other hobbies or activities.  He described himself as "sort of antisocial."

On September 20, 2004 plaintiff filled out a function report. (Tr. 89).  This report indicates that plaintiff prepares sandwiches and frozen dinners on a weekly basis.  He does very little cleaning and travels by cab.  He shops for food twice a month and is able to pay bills and count change.  He talks on the phone and attends church "every now and then."  He reported that he doesn't get out very often and that he has problems with concentration, understanding and following written and spoken instructions.  He further reported that he does not handle stress or changes in routine very well.

A representative of plaintiff's last employer completed a work activities questionnaire regarding plaintiff.    (Tr.   104). Plaintiff's job with this employer involved washing racks, tubs, carts and other items.  He pushed and pulled racks, did laundry as well as other miscellaneous tasks.  This report stated plaintiff had no limitations or impairments in his ability to perform his job duties.  According to the report, plaintiff had no problems in understanding  or  following  instructions  and  had  no  problems

10

performing his expected duties in a timely and satisfactory manner. Plaintiff did not require extra supervision, was able to concentrate adequately, and was capable of learning new tasks within an acceptable time frame.  He had no difficulty getting along with co-workers, supervisors or the public.

On this record, the court finds that substantial evidence does not support the ALJ's conclusion that plaintiff lacks "the requisite deficits in adaptive functioning" to be categorized under Listing 12.05 as mentally retarded.  The ALJ appears to rely on two types of evidence to support this conclusion: the report from plaintiff's employer and the reports regarding plaintiff's daily activities.

As for the report from plaintiff's employer, the record obviously supports the conclusion that plaintiff had the mental capacity to perform his sanitation job at the meat packing plant. However, this is not a sufficient basis to find that plaintiff lacks "the requisite deficits in adaptive functioning."  As noted previously, adaptive skill areas include:  communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work.  Witt, 446 F.Supp. at 895; see also Morris v. Dretke, 413 F.3d 484, 487 (5th Cir. 2005) (quoting American Association on Mental Retardation, MENTAL RETARDATION:  DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORT 5 (9th ed. 1992)).  To be "mentally retarded" an individual

must have significant limitations in at least two of those skill areas. Id. Plaintiff's job performance does not demonstrate that he lacks significant limitations or deficits in such adaptive skills as self-care, home living, social skills, community use, self-direction, health and safety, functional academics and leisure.

As for the reports of plaintiff's activities, the record indicates that plaintiff does little cleaning, shopping or cooking. His grooming and hygiene are subpar. He does not use public transportation. There is a mixed record with regard to paying bills and handling money. For the purpose of this opinion, the court assumes that plaintiff can perform those tasks. Plaintiff can also use a telephone. The ALJ construed the reports as indicating that plaintiff is able "to complete a wide range of activities." (Tr. 20). This somewhat vague characterization does not specifically address the relevant skill areas; nor does it seem completely accurate. The ALJ also thought the discrepancy between the two reports suggested an attempt by plaintiff to maximize his actual problems or limitations. (Tr. 20). While this is possible, the discrepancy may also relate to plaintiff's ability to rely upon his wife to do things for him. Plaintiff's wife was apparently growing seriously ill during the time the reports were completed.

In summary, we believe the ALJ has failed to properly articulate findings to support the conclusion that plaintiff lacks

"the requisite deficits in adaptive functioning" as stated in Listing 12.05C.  In addition, contrary to the implication of the ALJ (see Tr. 16), the evidence supports a finding that the deficits in adaptive functioning initially manifested before plaintiff reached the age of 22.  See Fox v. Astrue, 2007 WL 1063198 (D.Kan. 2007) (evidence of mental retardation after age twenty-two is some evidence of mental retardation before age twenty-two); Mitchell v. Barnhart, 2004 WL 1626409 (D.Kan. 2004) (same).  Plaintiff did not finish the tenth grade.  He took special education courses in school.  There is nothing in the record to indicate that his mental impairments developed after the age of 22.

Accordingly, the court believes this case must be remanded for the defendant to determine whether plaintiff's condition meets or equals the Listing 12.05C and to explain how the evidence on the record as a whole supports the decision.  It would not be proper for the court to weigh the evidence on this record and either affirm the ALJ's decision or substitute a different judgment for the decision of the ALJ.  See Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007) (court may not reevaluate the evidence or substitute its own judgment for the judgment of the Commissioner); Blackwell v. Astrue, ____ F.Supp.2d ___, 2007 WL 4206996 (D.Kan. 2007) (remand for further proceedings necessary if court cannot determine whether administrative record was fully developed with substantial and uncontroverted evidence indicating disability).

13

Use of grid regulations - Step 5

At step 5 of the analysis, after determining that plaintiff could not return to his past relevant employment, the ALJ determined that there were jobs that exist in significant numbers in the national economy which plaintiff could perform.  He reached this conclusion by relying upon medical-vocational guidelines ("grids"), specifically Rule 202.10.  See 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 202.10.  Plaintiff contends that reliance upon the grid regulations was improper in a case such as this where plaintiff has non-exertional impairments.  The Tenth Circuit has held that "resort to the grids is particularly inappropriate when evaluating non-exertional limitations such as pain and mental impairments."  Hargis v. Sullivan, 945 F.2d 1482, 1490 (10th Cir. 1991).  "[T]he grids cannot be applied conclusively if a claimant has non-exertional limitations that significantly limit his 'ability to perform the full range of work in a particular [residual functional capacity]' category on a sustained basis."  Williams v. Bowen, 844 F.2d 748, 752 (10th Cir. 1988) (quoting Teter v. Heckler, 775 F.2d 1104, 1105 (10th Cir. 1985)). In such cases, the defendant must produce a vocational expert to testify that a claimant retains the ability to perform substantial gainful employment.

In this case, Dr. Warrender, the non-examining psychologist relied upon by the ALJ, found that plaintiff had mild mental

14

retardation as well as moderate limitations in maintaining concentration, persistence or pace.  We believe these would be examples of non-exertional limitations which significantly limit the ability to perform the full range of light work on a sustained basis.  Cf., <u>Muncy v. Apfel</u>, 247 F.3d 728, 735 (8th Cir. 2001) (borderline intellectual functioning is a significant non-exertional impairment that should be considered by a vocational expert); <u>Holz v. Apfel</u>, 191 F.3d 945, 947 (8th Cir. 1999) (same); <u>Foreman v. Callahan</u>, 122 F.3d 24, 26 (8th Cir. 1997) (same).

The court has already determined that this case should be remanded for further findings with regard to Listing 12.05C.  If this was not so, the court would direct that this case be remanded with the direction that defendant present vocational expert testimony and identify what jobs, if any, plaintiff could perform.

CONCLUSION

The decision to deny benefits is reversed and judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) remanding this case to defendant for further proceedings in accordance with this opinion.

**IT IS SO ORDERED.**

Dated this 3rd day of January, 2008 at Topeka, Kansas.


                              s/ Richard. D. Rogers
                              United States District Judge


15